Edith W. Abrams v. Commissioner.
Abrams v. Commissioner
Docket No. 83074.
United States Tax Court
T.C. Memo 1961-287; 1961 Tax Ct. Memo LEXIS 62; 20 T.C.M. (CCH) 1501; T.C.M. (RIA) 61287; October 17, 1961
Sidney B. Gambill, Esq., and Edward I. Roth, Esq., 1259 Denniston St., Pittsburgh, Pa., for the petitioner. Charles A. Boyce, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies as follows: Sec.
Sec.
Sec.
Sec.
293(b)
6653(b)
294(d)(2)
294(d)(1)(A)
Year
Income Tax
IRC of 1939
IRC of 1954
IRC of 1939
IRC of 1939
1952
($ 522.74)
$379.86
$813.86
1953
2,637.80
$1,318.90
344.20
1954
3,353.07
$1,676.54
270.06
*63 The parties have stipulated certain adjustments which have the effect of eliminating the amounts of the deficiencies determined for 1953 and 1954, and resulting in an overpayment for 1952. The petitioner, by amended petitions, claims overpayments as follows: 1952
$9,646.66
1953
5,098.94
1954
5,718.33
The first question is whether the petitioner is taxable as a partner or joint venturer, or as the assignee of a portion of a partnership interest in McKees Rocks Industrial Enterprises (sometimes hereinafter called "Enterprises".) Further remaining questions are whether the petitioner, if held to be an assignee, is entitled first to recover her basis for the assigned interest before realizing any income from the transaction; and whether the petitioner is subject to addition to tax under section 294(d)(1)(A), I.R.C. of 1939 for failure to file a timely declaration of estimated income tax for 1952, and under section 294(d)(2) for a substantial underestimate of estimated tax for 1952. The additions to tax for fraud determined for 1953 and 1954 have been conceded by the Commissioner at the hearing. Findings of Fact Those facts which have been stipulated are hereby *64 found as stipulated. The petitioner filed her federal income tax returns for the years 1952, 1953, and 1954 with the director of internal revenue, Pittsburgh, Pennsylvania. Her returns were filed on the cash receipts and disbursements method of accounting. The petitioner's husband died on May 11, 1951, as a result of an automobile accident on that day, and the petitioner inherited all of his properties, including the interest in McKees Rocks Industrial Enterprises hereinafter described. Leonard Morey, Paul McBeth, and Charles Samuel entered into a partnership agreement dated June 15, 1950. McBeth resided in Pittsburgh, Pennsylvania. Morey and Samuel resided in New York. McBeth was engaged in the machine tool business in Pittsburgh. Morey was a machinery dealer. Samuel was in the scrap business. Their businesses were substantial. The purpose of the partnership was to acquire, in McKees Rocks, a suburb of Pittsburgh, the assets of Pressed Steel Car Company, Inc., and its subsidiary, Pittsburgh, Allegheny and McKees Rocks Railroad Company. Pressed Steel Car Company was a large but financially distressed business. The purchase price was approximately $2,240,000. The assets were acquired *65 in order to liquidate the scrap, machinery, and other equipment and to rent or sell the real properties of these businesses. The partnership agreement was, in part, as follows: Agreement of Partnership * * * I. The name of the partnership shall be "McKees Rocks Industrial Enterprises." * * *
III. This Agreement shall be effective as of June 15, 1950 and thereafter shall continue in full force and effect to and including the fourteenth day of June, 1953 and may be extended thereafter by the unanimous consent of all the Partners. IV. The Partners have made the following contributions to the partnership, which amounts were paid over to Pressed Steel Car Company, Inc., on the fifteenth day of June, 1950, on account of the purchase price of the above described properties and assets: Leonard Morey
$ 33,333.34
Charles Samuel
33,333.33
Paul McBeth
33,333.33
Total
$100,000.00 The Partners agree that any additional funds required by the partnership shall be contributed one-half by Leonard Morey and one-half by Charles Samuel, and that Paul McBeth shall not be required to make any further contribution to the partnership except to the extent necessary *66 to satisfy his obligation to bear a proportion of the partnership losses as hereinafter in Paragraph V set forth. V. The interests of the respective Partners in the partnership and in the properties and assets owned by it shall be as follows: Leonard Morey
41,66 2/3%
Charles Samuel
41.66 2/3%
Paul McBeth
16.66 2/3% The partners shall share all profits and distributions in accordance with the foregoing percentages, and all losses shall be borne by the Partners in the same percentages. * * *
In the event of the death of any Partner, the partnership shall not be terminated thereby, but the partnership and its business shall continue, nevertheless, until the end of the fiscal year in which such death occurs, at which time the partnership shall terminate. Upon any such death, the estate of the deceased Partner shall immediately succeed to the interests of, and shall stand in the place and stead of, the deceased Partner, but shall have no right or voice in the management and conduct of the partnership business. In the event the partnership terminates at the end of the fiscal year in which a Partner dies, or as a result of any other cause, all the remaining *67 assets and properties of the partnership shall be distributed among the Partners and the estates of any deceased Partners in proportion to the interests of the respective Partners as set forth in Paragraph V hereof and a final accounting rendered to all the Partners and the estates of any deceased Partners. VIII. All Partners shall have equal rights in the management and conduct of the partnership business. None of the Partners shall enter into any contract or engagement or give credit or lend any of the partnership monies or dispose of any partnership assets or give any bill, note, or security or contract any debt on account of the said partnership, except with the consent of the others. The Partners agree, however, to execute such applications, agreements, or other documents (a) as may be necessary or desirable in order to obtain a surety bond or undertaking of a surety company to secure payment of a portion of the purchase price of the property and assets to be acquired as contemplated in the said Agreement dated as of June 15, 1950, between Pressed Steel Car Company, Inc., and the Partners, or (b) as may be necessary or desirable in order to obtain funds sufficient to pay such *68 portion of the purchase price at the time of closing under said Agreement in lieu of obtaining any such bond or undertaking, or (c) as may otherwise be required by the terms of said Agreement. It is understood and agreed, however, that Leonard Morey and Charles Samuel will each supply one-half of any collateral or other security which may be necessary or desirable, in addition to the assets of the partnership, in order to obtain such bond or undertaking, or to obtain funds to make such payment in lieu thereof, and that Leonard Morey and Charles Samuel shall indemnify Paul McBeth for sums paid by him by reason of any applications, agreements, or other documents executed by him pursuant to this paragraph, provided that this provision shall not effect Paul McBeth's obligation to bear his proportionate share of any losses as set forth in Paragraph V hereof. * * *
IX. Accurate accounts shall be kept of all matters relating to the partnership business. Monthly trial balances shall be prepared and submitted to each Partner. * * *
Each of the three partners invested $33,333.33 in the partnership, which was used to make a down payment of $100,000 on the purchase of the assets. *69 This is the only capital contributed by the partners which was reflected on the books of Enterprises other than what is reflected as undistributed profits. Sidney A. Abrams, the petitioner's husband, entered into an agreement with Samuel on June 15, 1950, as follows: * * * Witnesseth WHEREAS, Abrams has heretofore paid to Samuel the sum of One Dollar and other good and valuable consideration to be used by Samuel as part of his contribution to the Joint Venture known as McKEES ROCKS INDUSTRIAL ENTERPRISES; and WHEREAS, the parties hereto wish to express their agreement with respect to the sum so paid by Abrams to Samuel; NOW, THEREFORE, in consideration of the payment of the above mentioned sum and in consideration of the mutual covenants and agreements herein contained, it is mutually agreed as follows: 1. Samuel agrees to pay and/or set over, assign and transfer to Abrams forty-eight per centum (48%) of his [then remaining] eight and one-third per centum (8 1/3%) interest in all distributions received by him from the said Joint Venture, whether representing profit, return of original contribution or otherwise, and forty-eight per centum (48%) of his eight and *70 one-third per centum (8 1/3%) interest in all stock, assets, or other forms of property or assets received by him as a distribution from said Joint Venture, promptly on receipt thereof by him. 2. Abrams agrees to pay to Samuel forty-eight per centum (48%) of eight and one-third per centum (8 1/3%) of any additional contributions that Samuel is called upon to make as a participant in said Joint Venture in accordance with the terms of said Samuel's Agreement, and further agrees to make available to Samuel forty-eight per centum (48%) of eight and one-third per centum (8 1/3%) of any collateral that Samuel may be required to make available to the Joint Venture pursuant to the terms of said Samuel's Agreement, a copy of which is hereunto attached, made a part hereof and marked "Exhibit A". 3. Samuel shall not be personally liable to Abrams for any loss that Abrams may suffer by reason of having paid said funds to him. Abrams, however, hereby agrees to indemnify Samuel to the extent of forty-eight per centum (48%) of any loss or liability which Samuel may personally incur by reason of his participation in the aforesaid Joint Venture to the extent of eight and one-third per centum (8 *71 1/3%) thereof, including any incurred under the provisions of said agreement of Samuel, or by reason of any obligations entered into by him personally in accordance with said Samuel's Agreement of Joint Venture. 4. This agreement shall not be assignable by either party hereto, but shall bind and inure to the benefit only of the parties hereto or their executors, administrators and legal representatives. * * *
The consideration paid by Abrams was $30,000. The petitioner inherited her husband's interest in the Samuel Agreement and it was valued for estate tax purposes, after an audit by an agent of the respondent, at $15,000. The three partners, Morey, Samuel and McBeth, at various times made assignments, similar to the Samuel-Abrams assignment, to other persons. Morey made assignments to his brother, Robert Morey; to his sister, Rose M. Dreyer; to Lillian Edwards; to Ick T. Himoff; to Dudly T. Himoff, a cousin; to Robert Himoff, a cousin; to Lenore Laderman, a cousin; to Ruth Sherlip, a cousin; to Julius Saloway, a relative by marriage; to Joseph Knopf, an officer of Morey Machinery Company; to Irma L. Green, Charles D. Kaufman, and Phyllis Bosworth, children of Morey's *72 accountant. At the time the partnership agreement was executed on June 15, 1950, each of the parties to that agreement was aware that each of them had disposed of a part of the interest which they held in the venture. This was acquiesced in because they thought the venture might be a total loss and they wanted some protection. A typical assignment by Morey was the assignment to Rose as follows: * * *
WHEREAS, the parties hereto have heretofore agreed that the party of the second party shall pay to Morey a part of the sum Morey has contributed to the capital of the partnership, and that in consideration thereof the party of the second part shall participate in Morey's interest in said partnership; NOW, THEREFORE, THIS AGREEMENT WITNESSETH: 1. Morey hereby acknowledges the receipt by him of the sum of Eleven Thousand Eight Hundred Twenty-five Dollars ($11,825.), which sum represents 66/750 of Morey's contributions to the capital of said partnership above set forth. In consideration of the payment thereof to him, Morey agrees, during the term of the partnership or any extension thereof, to pay or turn over to the party of the second part 66/750 of all distributions of profit *73 and 66/750 of all distributions representing return of capital received by him from said partnership, whether in the form of cash, stock, assets or other forms of property, promptly on receipt thereof by him. 2. The party of the second part agrees to pay to Morey an amount equal to 66/750 of any additional capital contributions the latter is called upon to make as a member of said partnership, and further agrees to make available to Morey 66/750 of any collateral Morey may be required to make available to the partnership, pursuant to the terms of the partnership Agreement. 3. Morey agrees to advise the party of the second part promptly (a) as to the amount of his share of the undistributed profits of the partnership for each fiscal period of the partnership, and (b) as to the portions of any sums paid to the second party hereunder which represent distributions of partnership profits and return of partnership capital, respectively. 4. Morey shall not be personally liable to the party of the second part for any loss the party of the second part may suffer by reason of having paid said funds to him, or having made such collateral available to him, or in the event that the distributions *74 received by the party of the second part shall have a value less than the amounts paid or to be paid and the collateral to be furnished to Morey in accordance herewith. The party of the second part, however, hereby agrees to indemnify Morey to the extent of 66/750 of any loss or liability which Morey may personally incur by reason of his membership in the aforesaid partnership, including any incurred under or in accordance with the provisions of the partnership Agreement. 5. This Agreement shall not be assignable by either party hereto, but shall bind and inure to the benefit of the executors, administrators and legal representatives of the parties hereto. * * *
Samuel made assignments, in addition to the Abrams assignment, to Abraham Rosenfeld, Joseph Gottleib, Louis J. Land, Joseph Labowitz, Daniel A. Morse, Raymond L. Moskowitz, Joseph A. Moskowitz, David Samuel, and Marion Calisch. McBeth made assignments to his two sons, Robert L. McBeth and Paul C. McBeth, Jr. of five percentage points of his 16 2/3 percent interest to each. The underlying participants will sometimes herein be referred to as underliers. Some of the underliers actively participated in the business of *75 Enterprises and the participating underlier, when consulted, was brought in only because he was regarded to be a partner. Two of the underliers of Samuel were active in the business, and rendered advice in its management. One was instrumental in selling a considerable amount of the personal property. One of the underlying participants of Samuel cooperated with Leonard Morey and Samuel to secure the loan of $750,000 from a lending institution to use in the business of Enterprises. The underliers of McBeth were consulted before McBeth made a decision affecting the partnership. The petitioner has never attended a partnership meeting of the Enterprises. She has never been invited to attend a meeting and her advice in connection with its affairs has never been sought. She visited the operation at McKees Rocks and talked with a Mr. Dennis there about the business. Prior to the hearing she had met only three of the partners and "distributees," i.e. Samuel, Labowitz and Morey. No business was discussed at these meetings. It was the intention of the underlying participants upon entering into the agreements with Samuel to purchase an interest in the entire venture of Enterprises, including *76 a proportionate share of all profits and losses. The method of operation of the Enterprises was not an unusual method of operation to Morey. He enters into these arrangements as many as five or six times a year. Morey has "syndicated" other similar ventures, such as New Albany Machine Company, New Albany, Indiana, and Globe Forge Company, Syracuse, New York. Morey explained that "syndicating" was done to relieve some of the financial burden and to possibly reciprocate to someone who brought him a job. The money contributed by the underliers of Morey, to the extent necessary, was used to reimburse or offset Morey's share of the contribution of $33,333 required by him. The partnership filed returns on a fiscal year basis ending June 30 of each year. These returns were signed by Morey, Samuel and McBeth. In its first return ending June 30, 1951, the partnership reported a loss of $9,042.80. Upon the audit of this return it was determined that it had ordinary net income of $105,078.34. For the fiscal year ending June 30, 1952 the partnership reported ordinary net income of $618,769.27. For the following fiscal year ending June 30, 1953, the partnership reported ordinary net income *77 of $409,102.87. In the partnership information returns for the fiscal years ending June 30, 1952, the ordinary net income of $618,769.27 was distributed as follows. SCHEDULE OF DISTRIBUTIVE SHARES OF
Leonard Morey &
Underlying Participants
Share of
41 2/3% Distributed
Net Profit
as follows:
Percentage
For Year
Leonard Morey,
9.%
$ 55,689.23
White Plains, N. Y.
Robert Morey,
8 1/3%
51,564.11
300 E. 57th St., N. Y.
Rose M. Dreyer,
3 2/3%
22,688.21
12 Claremont Drive,
Short Hill, N. J.
Lillian Edwards,
3 2/3%
22,688.21
Elmsford, N. Y.
Ick T. Himoff,
1.7777 %
10,999.87
White Plains, N. Y.
Dudly T. Himoff,
2.61115%(7%)
16,156.99
White Plains, N. Y.
Robert Himoff,
2.61115%
16,156.99
White Plains, N. Y.
Leonore Laderman,
.5/6%
5,156.41
c/o Sam Morey,
860 Fifth Ave.,
New York, N. Y.
Ruth Sherlip,
.5/6%
5,156.41
c/o Sam Morey,
860 Fifth Ave.,
New York, N. Y.
Julius Saloway,
3 1/3%
20,625.64
42 East End Ave.,
New York, N. Y.
Joseph Knopf,
1 2/3%
10,312.82
73-18 189th Avenue,
Flushing, N. Y.
Irma L. Green,
1%
6,187.69
4 Hayes Drive,
Tuckahoe, N. Y.
Charles D. Kaufman,
1 1/3%
8,250.26
24 Fifth Ave.,
New York, N. Y.
Phyllis Bosworth,
1%
6,187.69
Kew Gardens Hills,
N. Y.
TOTAL
41 2/3%
257,820.53
Charles J. Samuel
& Underlying Par-
ticipants 41 2/3%
Distributed as
Net Profit
follows:
Percentage
For Year
Abraham Rosenfeld,
3 1/4%
$ 20,110.00
385 Ft. Washington
Ave., New York
N. Y.
Joseph Gottleib,
2 1/2%
15,469.23
209 Washington St.,
Boston, Mass.
Edith Abrams,
3-11/12%
24,235.13
206 S. Dallas Ave.,
Pittsburgh, Pa. (3.916)
Louis J. Land,
10%
61,876.93
142 Grand St.,
New York, N. Y.
Joseph Labowitz,
4%
24,750.77
2265 University Ave.,
Bronx, N. Y.
Daniel A. Morse,
.3/8%
2,320.38
190-37 Ill. Ave.,
Hollis, N. Y.
Raymond L. Moskowitz,
1%
6,187.69
601 Arnold Rd.,
W. Hempstead, N. Y.
Joseph A. Moskowitz,
6 1/8%
37,899.62
533 Woodmere Blvd.,
Woodmere, N. Y.
David Samuel,
2%
12,375.39
333 W. 56th St.,
New York, N. Y.
Marion Calisch,
1%
6,187.69
353 W. 56th St.,
New York, N. Y. N. Y.
Charles J. Samuel,
7 1/2%
46,407.70
353 W. 56th St.,
New York, N. Y.
TOTAL
41 2/3%
257,820.53
Paul C. McBeth, and
Underlying Participants
16 2/3% Distributed as
follows: Paul C. McBeth,
6 2/3%
41,251.29
1600 Williamsburg Rd.,
Pittsburgh 28, Pa.
Robert B. McBeth,
5%
30,938.46
33 Orchard Spring Rd.,
Pittsburgh, Pa.
Paul C. McBeth,
5%
30,938.46
1600 Williamsburg Rd.,
Pittsburgh 28, Pa.
TOTAL
16 2/3%
103,128.21
GRAND TOTAL
100%
618,769.27
*78 A similar statement as to distribution, with certain minor changes, was attached to the partnership return for the fiscal year ending June 30, 1953. The partnership return for the fiscal year ending June 30, 1951, is not in evidence. The petitioner reported income from Enterprises for 1952, 1953, and 1954 as if she were a partner in the venture. Land, who was also one of the underliers, reported his share of the partnership profits in a similar manner. McBeth had brought to Morey's attention the fact that the assets of Pressed Steel Car Company and its subsidiary were for sale. Morey, his father, and others went to Pittsburgh and examined the properties. Morey then told Samuel about the possibilities. It was thought that Samuel might be of assistance in connection with the venture because they knew that there was an enormous amount of scrap material in the yard. Samuel was a large scrap dealer. The assets of Pressed Steel Car and its subsidiary included more than 100 acres of real estate, buildings, cranes, machine tools, presses, and scrap material. It had been a large manufacturer of railroad cars, but was not in operation in June 1950. Through speedy liquidation and rentals, *79 funds were provided for paying the purchase price without any additional capital contribution by the partners. Morey made further advances as loans to Enterprises and he required his underliers to contribute their proportionate share of these advances. When the loans were repaid to Morey he repaid his underliers. The fictitious name, McKees Rocks Industrial Enterprises was registered on January 19, 1951, in the office of the Prothonotary, Allegheny County, Pennsylvania. Only Leonard Morey, Charles Samuel and Paul McBeth were shown as partners. This was done because it was thought to be too difficult to get a large number of people together at one time to sign necessary papers. The three partners, Leonard Morey, Charles Samuel, and Paul McBeth, entered into the following agreement on May 28, 1953: * * *
(HEREINAFTER, each of said parties [Morey, Samuel and McBeth] is individually referred to as "partner" and collectively referred to as "partners".) * * *
WHEREAS, by the terms of said Agreement the term of existence of said partnership ends the fourteenth (14) day of June, 1953, and the partners desire to extend the said term by an Agreement delivered simultaneously *80 with this Agreement; and WHEREAS, it now appears that each one of the partners has made Agreements with various other persons (all of such other persons being hereinafter called "participants") whereby the latter participate in the interests and profits derived by such partner from the partnership; and * * *
1. Each partner, for himself, his heirs, executors, administrators and assigns, agrees to and hereby does indemnify and agrees to save harmless each and both of the other partners and their respective executors, administrators, heirs and assigns from and against all claims, debts, demands, actions, accountings and causes of action whatsoever asserted or brought by any participant of his or anyone claiming under, by or through any such participant arising in any way from, through, out of or in connection with the existence of the partnership "McKees Rocks Industrial Enterprises", or any term or extension of term thereof, or in connection with or by reason of the affairs, acts, business or transactions of said partnership, including any payments or distributions therefrom, and any and all transactions, actions, agreements, distributions, assignments, sales or anything else *81 between him and any participant of his, all to the intent that no participant under any partner has any rights whatsoever against the other partners. Nothing herein contained, however, shall limit any rights of the partners against each other or to impose any additional obligations to each other except as herein expressly provided. 2. This Agreement shall be construed and interpreted in conformity with the laws of the Commonwealth of Pennsylvania. * * *
Consideration was given at one time to changing Enterprises into a corporation. Underliers were contacted with reference to such action. It was the intent of all of the parties, including the petitioner, that Enterprises be operated as a partnership or joint venture, each sharing in the profits and losses of the business in proportion to the interest each owned. At the time of the death of the petitioner's husband on May 11, 1951, she had had no business experience and was unfamiliar with tax returns. At the time of the hearing she was employed as a sales clerk in a sportswear shop. After her husband's death she turned over all of her tax matters to her brother-in-law, Edward I. Roth, a Pittsburgh attorney and a certified *82 public accountant. He rendered no exceptional services to her before the end of that year and received no information with respect to the 1952 return. The petitioner received her first distributions from Samuel under the agreement between Samuel and her deceased husband late in 1952, $4,221.50 on September 30, 1952, and $7,553.53 on December 29, 1952. She received from Samuel $9,652.23 in 1953 and $11,681.47 in 1954. Roth prepared a 1952 estimate for the petitioner to sign, estimating $2,712 as her tax for 1952. This was in excess of the tax shown on her return for 1951, in the amount of $933.64. This estimate was signed by the petitioner on January 2, 1953 and delivered to Roth. The stamp of the Internal Revenue Service indicates that the estimate was received with remittance on January 20, 1953. The record shows no explanation as to why Roth did not file the estimate until January 20, 1953. Roth was solely responsible for filing this estimate after it was executed by the petitioner on January 2, 1953. In the statutory notice the respondent determined that the petitioner's 1952 income subject to tax was $23,835.04. She reported net taxable income of $24,760.80. In the net worth *83 statement as stipulated by the parties, it was determined that the petitioner's net distributive share of partnership income of McKees Rocks Industrial Enterprises was $26,603.56. The petitioner reported $1,032.84 income from interest on mortgages on her return for the taxable year 1952. She also received and reported partnership income of $4,053.67 for the taxable year 1952 from the Esquire Liquor Store. She had sold her interest in the Esquire Liquor Store on February 18, 1952. The petitioner's failure to file an estimate prior to March 15, 1952 was not due to reasonable cause. Opinion The primary question is whether the petitioner is a partner or joint venturer in the Enterprises partnership. She claims that she is not, but, through her deceased husband, by reason of a "side agreement", was a mere assignee of Samuel, who was one of the "original" partners. This status, she argues, permits her to be taxed only on the amounts actually received from Samuel, and first to recover a cost basis of $15,000. The Commissioner contends that the petitioner was taxable on the distributable income, as a partner or joint venturer of Enterprises, or in the alternative, as a joint venturer *84 in Samuel's partnership interest. We hold that the Commissioner is correct. The formal agreements between the parties in some respects tend to support the petitioner's contentions. But these agreements are inconsistent within themselves, and make an equally strong case against the petitioner, because they establish that the petitioner in addition to the right to a share of the income is entitled to share in increases in net worth, and was obligated to contribute proportionately to needs for additional capital and to share proportionately the losses which may arise from the business itself. In any event the teaching of Commissioner v. Culbertson, 337 U.S. 733 is that the proper concern for tax purposes are the realities of the partnership situation and not the written documents relating to the partnership. Here the action, conduct, and testimony of the parties to the basic partnership agreement, and to the underliers' agreements and of the petitioner herself, prior to the present dispute, clearly established that their intention was that the petitioner and the other "underlying participants" were partners within the meaning of the critical provisions of section 3797 *85 of the Internal Revenue Code of 1939, [1] and section 761 of the Internal Revenue Code of 1954. [2]
Rosenfeld and Land, who were underlying participants, testified that they intended to and did become partners by buying an interest comparable to that held by the petitioner, and McBeth who was a party to the basic partnership agreement testified that an underlier was a partner and Morey who was also a party to the basic agreement testified to the same effect. The information returns filed by the partnership *86 named and attributed the full proportionate distributive share of the business to basic partners and the underliers, including the petitioner, respectively. The petitioner reported these amounts attributed to her in her appropriate returns. The petitioner's husband and other underliers paid for the partnership interest in question, and in effect contributed a portion of Samuel's capital contribution. And it is also to be noted that some of the underliers were active in the business affairs of the partnership. They were consulted and advised in its management; were instrumental in the sale of the property which was being liquidated; and aided in borrowing money for the business. The petitioner kept herself advised of the operation of the business of the partnership by personally viewing it, and at least she can be said to have made an informed acquiescence in the work of the more active managing partners. See Estate of Philip Landau, 21 T.C. 727, affd. 219 F. 2d 278 (C.A. 3). Upon a consideration of all the circumstances we conclude that the real intent of the parties was that the underlying participants were a member of a "syndicate, group, pool, joint *87 venture, or other unincorporated organization by means of which [a] business * * * or venture was carried on." The petitioner was correct when she reported Enterprises income on her returns for 1952, 1953, and 1954 as a partner in the venture. If the petitioner was not a partner in Enterprises she was certainly a partner, in the tax sense, with Samuel. Many of the factors recited and relied upon above establish this. In that status she is required to report as her income her distributive share of Samuel's distributive share of Enterprises. Harry Klein, 18 T.C. 804 and Erwin de Reitzes-Marienwert, 21 T.C. 846. The Commissioner must also be sustained in his determination that the petitioner was liable for additions to tax for 1952 under section 294 (d)(1)(A) of the Internal Revenue Code of 1939 for failure to file a timely declaration of estimated income tax. The petitioner was required by section 58(a)(2) to file such a declaration of estimated tax by March 15, 1952 if her gross income at that time "from sources other than wages * * * can reasonably be expected *88 to exceed $100 for the taxable year and [her] gross income to be $600 or more." The findings disclose that petitioner for 1952 reported mortgage interest income of $1,032.84 and income of $4,053.67 from a liquor store partnership. The petitioner has not shown that she had not received or could not have expected this income at the time the estimated tax return was due. Nor has the petitioner established that before the end of 1952 she had informed her attorney of the material facts concerning her tax situation. There is, therefore, no basis for the argument that her reliance upon the attorney constituted reasonable cause for not filing the required estimated tax return. John T. Potter, 27 T.C. 200. All other matters raised by the notice of deficiency have been disposed of by concession on brief or by agreement of the parties. Decision will be entered under Rule 50. Footnotes
1. SEC. 3797. DEFINITIONS. (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof - * * *
(3) Partnership and Partner. - The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; * * * (a) Partnership. (of substantially similar import)↩
2. SEC. 761↩. TERMS DEFINED.